IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

AMY DEAVERS,

     Plaintiff,

v.          CIVIL ACTION NO.   2:21-cv-00423

JOSHUA MARTIN, et al.,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendants Scott Lowther's ("Lowther") Motion for Summary Judgment, (ECF No. 59); Mike King's ("King") Motion for Summary Judgment, (ECF No. 61); and Joshua Martin ("Martin") and the Kanawha County Commission's ("Kanawha County") Motion for Summary Judgment, (ECF No. 63).   For the reasons more fully explained below, Lowther and King's motions, (ECF Nos. 59 and 61, respectively), are **GRANTED IN PART** and **DENIED IN PART**.   Martin and Kanawha County's motion, (ECF No. 63), is **GRANTED IN PART** and **DENIED IN PART**.   Further pending before the Court is Scott Lowther and Mike King's Motion to Join Defendants Joshua Martin and Kanawha County Commission's Motion for Summary Judgment.   (ECF No. 66.)   As explained below, this motion is **DENIED**.[1]

---

[1] The motion, though styled as a motion to join, raises a new argument for both Defendants Lowther and King as to why they should be granted summary judgment.   The deadline for filing motions for summary judgment in this matter was extended to June 27, 2022.   (ECF No. 58.)   On that day, Lowther and King both filed their respective motions for summary judgment, as did Martin.   (*See* ECF No. 59, 61, and 63.)   Notably, among other arguments, Martin argued that he is entitled to qualified immunity, but neither Lowther nor King raised that argument in their motions. Then, on July 11, 2022, a full two weeks past the original deadline, Lowther and King filed their "motion to join" and argued that they too are entitled to qualified immunity.   (*See* ECF No. 66.)   Though styled as a motion to join,

## II.   BACKGROUND

### A.  Factual Background

This action arises out of an alleged unreasonable search and seizure by members of a joint task force in the execution of an arrest on June 15, 2020, in Glasgow, Kanawha County, West Virginia.   On June 3, 2020, the Circuit Court of Kanawha County, West Virginia, issued a *capias* against Florence Kiewra ("Kiewra") for a violation of furlough on an original charge of possession with intent to deliver heroin.   (ECF No. 68–1.)   On June 13, 2020, the Kanawha County Sheriff's Department ("Kanawha County Sheriff") received a tip indicating that Kiewra was "hiding out at 307 3rd Ave in Glasgow at Tabatha deavers [*sic*] residence."   (ECF No. 68–2.)   At the time relevant to this action, Plaintiff Amy Deavers ("Plaintiff") resided at 307 Third Street in Glasgow, along with her fiancé, David Neville.   (ECF No. 68–3 at 3.)   Tabitha Deavers, Plaintiff's adult daughter, did not live at the residence at the time in question, nor did Kiewra.   (*Id.* at 19.)

On June 15, 2020, Deputy United States Marshal Scott Hill ("DUSM Hill") was supervising the United States Marshals Service ("Marshals Service") C.U.F.F.E.D. Task Force[2] ("Cuffed Task Force"), a joint task force the purpose of which was to locate and apprehend individuals who were subject to federal and state arrest and search warrants.   (ECF No. 59–1 at ¶ 5.)   The task force was generally comprised of members of the Marshals Service and local law

---

Lowther and King's motion instead asserted a new argument for summary judgment which should have been raised on or before the June 27 deadline.   It was not, and therefore, the argument has been waived. *See Cox v. SNAP, Inc.*, 859 F.3d 304, 308, n.2 (4th Cir. 2017) ("However, SNAP failed to advance this argument in its summary judgment papers and has therefore waived this defense."); *Blake v. Radcliff*, No. 5:03-2109, 2005 WL 1377883 at *4 (S.D. W. Va. June 8, 2005) (denying a "qualified immunity supplement" to motion for summary judgment as an untimely assertion of a previously unraised legal defense).   The motion, (ECF No. 66), is accordingly **DENIED** as untimely.

[2] The full title of this task force is the Cops United Felony Fugitive Enforcement Division, also known as the "C.U.F.F.E.D.  Task  Force."    *Southern District of West Virginia*, U.S. MARSHALS SERVICE, https://www.usmarshals.gov/local-districts/southern-district-of-west-virginia (last visited Sep. 19, 2022).   As the parties refer to the task force as simply the "Cuffed Task Force," the Court shall also for ease of reference and readability.

enforcement personnel who have been specially deputized by the Marshals Service to serve on the task force.  (*Id.* at ¶ 4.)   Local law enforcement personnel who have been specially deputized to serve on the Cuffed Task Force by the Marshals Service are supervised by the Deputy United States Marshal assigned for duty with the Cuffed Task Force on that date while executing search and arrest warrants and when taking individuals into custody who are the subject of the arrest warrants.  (*Id.* at ¶ 5.)   While serving on the Cuffed Task Force and engaging in task force activities, local law enforcement personnel are considered federal officers.  (*Id.*)

DUSM Hill met with the members of the Cuffed Task Force on June 15 to discuss and assign the warrants which were to be executed on that date.  (*Id.* at ¶ 6.)   Following this meeting, the members of the Cuffed Task Force proceeded to enter vehicles provided by the Marshals Service and traveled to various locations to execute the warrants and take those individuals who were subject to the warrants into custody.  (*Id.*)   The members assigned to Kiewra's warrant were DUSM Hill, Deputy United States Marshal Justin Mounts,[3] and Special Deputies Martin, King, and Lowther.   (*Id.* at ¶ 7.)

Based on the tip received by the Kanawha County Sheriff, the above members of the Cuffed Task Force travelled to 307 Third Avenue in Glasgow, West Virginia, whereupon they discovered that the address was not the Deavers' residence.  (*Id.* at ¶ 8.)   Instead, the members of the Cuffed Task Force learned that Tabitha Deavers was located at 307 Third Street and traveled to that location to execute the warrant.   (*Id.*)

Upon arrival at 307 Third Street, the members of the Cuffed Task Force approached the front door of the residence and knocked.   (*Id.* at ¶ 9, ECF No. 68–5 at 4.)   Either DUSM Hill or Martin identified themselves and asked whether Kiewra was present and stated that the Cuffed

---

[3] Neither DUSM Hill nor DUSM Mounts are parties to this action.

Task Force had a warrant for Kiewra's arrest.   (ECF Nos. 59–1 at ¶ 9; 68–5 at 4.)   Plaintiff, who answered the door, acknowledged that Kiewra was present.   (ECF No. 68–5 at 4.)   DUSM Hill avers that he "had [Plaintiff's] consent to enter the residence to execute the warrant to arrest Kiewra."   (ECF No. 59–1 at ¶ 9.)   However, Martin testified that Plaintiff did not give her consent for the members of the Cuffed Task Force to enter the home and asked to see a warrant. (ECF No. 68–5 at 4–5.)   Martin refused to show Plaintiff the warrant until after they had apprehended Kiewra because of "officer safety."   (*Id.* at 5.)   Martin then "brushed by [Plaintiff] and went inside the residence" to locate Kiewra.[4]   (*Id.* at 4.)

As Martin entered the residence, Plaintiff put her hand up to attempt to stop the entry, at which point Defendant King grabbed Plaintiff's arm in an "arm bar," spun her around, swept her legs out from under her, and placed her in handcuffs.   (ECF Nos. 68–3 at 5; 68–6 at 7.)   Once Plaintiff was detained, King followed Martin into the residence.   (ECF No. 68–6 at 7.)   Kiewra was thereafter located in the residence and taken into custody without further incident.   (ECF No. 68 at 4.)   DUSM Mounts and Defendant Lowther were not involved in the physical arrest of Kiewra, as they were positioned outside of the residence while the arrest was effectuated.   (ECF No. 59–1 at ¶ 10.)   However, as Kiewra was escorted out of the back room, Defendant Lowther entered the residence and noted that Plaintiff was "on the ground and a task force officer [was] kneeling beside her."   (ECF No. 68–7 at 7.)

---

[4] There appears to be some confusion as to who entered the residence first.   In his affidavit, DUSM Hill avers that Plaintiff gave her consent and that he entered the residence first, followed closely by Martin.   (ECF No. 59–1 at ¶ 9.) Yet, Martin's testimony seemingly shows that he was the officer communicating with Plaintiff—who, by Martin's own words, did not consent to entry of the residence—and that he was the first one to enter the residence.   (ECF No. 68–5 at 4 ("She said, 'You're not coming in the house.'   So I brushed by her and went inside the residence and attempted to locate our fugitive.'").)   Defendant King also remembers Martin entering first, but does not recall DUSM Hill entering.   (ECF No. 68–6 at 7.)

4

Following Kiewra's arrest, DUSM Hill returned to the front of the residence.   (ECF No. 59–1 at ¶ 11.)   There, DUSM Hill observed that Plaintiff had been taken into custody "for trying to interfere with the arrest of Kiewra."   (*Id.*)   After some consideration, the members of the Cuffed Task Force decided not to charge Plaintiff and released her from custody.   (*Id.*)   Plaintiff believes she was detained in handcuffs on the ground for somewhere between five and ten minutes.   (ECF No. 68 at 4.)

### B.   Procedural Background

Plaintiff filed her complaint in the Circuit Court of Kanawha County, West Virginia on June 15, 2021, wherein she asserted four causes of action.   (ECF No. 1–1.)   Thereafter, Kanawha County and Martin removed the action to this Court on July 28, 2021, pursuant to federal question jurisdiction under 28 U.S.C. § 1331.   (ECF No. 1.).

On October 27, 2021, King and Lowther jointly filed a motion to dismiss, as well as a motion to substitute the United States in lieu of themselves.[5]   (*See* ECF Nos. 15, 17.)   On January 26, 2022, King and Lowther filed a motion to stay proceedings pending the adjudication of their motions to dismiss and substitute.   (ECF No. 29.)   On February 14, 2022, the Court granted the motion to stay, pending resolution of the motions.   (ECF No. 32.)   Subsequently, on February 23, 2022, the Court denied the Defendants' various motions, while also granting Plaintiff's request to amend her complaint.   (ECF No. 33 at 13–14.)

Plaintiff filed her Amended Complaint on March 4, 2022.   (ECF No. 35.)   In her Amended Complaint, Plaintiff has asserted three causes of action.   Count I asserts a violation of her constitutional rights through the alleged unreasonable search and seizure and is brought

---

[5] On November 15, 2021, after the motions became ripe, Kanawha County and Martin filed a motion to join in the motions.   (ECF No. 24.)

pursuant to 42 U.S.C. § 1983 or, in the alternative, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  (*Id.* at 4.)   Count II similarly asserts a violation of Plaintiff's constitutional rights through her alleged unlawful detainer and the task force's use of excessive force and is brought pursuant to 42 U.S.C. § 1983 or, in the alternative, *Bivens*.   (*Id.* at 4–5.)   Finally, Count III asserts a cause of action of negligence and is brought against Kanawha County.   (*Id.* at 5–6.)

On June 27, 2022, Lowther, (ECF No. 59); King, (ECF No. 61); and Martin and Kanawha County, (ECF No. 63), filed their respective motions for summary judgment.   Plaintiff responded in opposition to each in a consolidated response filed on July 11, 2022.   (ECF No. 68.)   Also on July 11, King and Lowther filed their titled "Motion to Join," purporting to join in Martin and Kanawha County's arguments for summary judgment.   (ECF No. 66.)   On July 17, 2022, King and Lowther filed their respective replies to their motions for summary judgment.   (ECF Nos. 69, 70.)   Then, on July 18, 2022, Plaintiff filed her response in opposition to King and Lowther's motion to join, (ECF No. 71), and Martin and Kanawha County filed their reply to their motion for summary judgment, (ECF No. 72).   With the briefing on these motions complete, they are now ripe for adjudication.

## II.   *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment.   It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact."   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   Summary judgment should not be granted if there are factual issues that

reasonably may be resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III.    DISCUSSION

Given the multiple, and often overlapping, arguments asserted by the Defendants in these motions, the Court will begin with an analysis of whether the officer defendants here are appropriately considered federal actors so as to identify the appropriate claim Plaintiff is pursuing. As will be explained below, the officers were properly considered federal actors, and accordingly the Court will then examine Plaintiff's claims in the proper *Bivens* context.  Finding that the claims do fit within the narrow scope of *Bivens*, the Court shall then take up Martin's argument as to qualified immunity.  Finally, the Court will proceed to whether Plaintiff has succeeded in showing any genuine dispute of material fact as to the Kanawha County Commission.

### A.  Plaintiff's Claims Pursuant to 42 U.S.C § 1983

Defendants Lowther and King's first argument is that as specially deputized members of the United States Marshals Service Cuffed Task Force, both were appropriately considered federal

officers during the events in question.   (ECF Nos. 60 at 7; 62 at 7.)   Because Lowther and King were federal actors, they argue that Plaintiff cannot pursue her claims pursuant to 42 U.S.C. § 1983, as "[t]he Supreme Court has long held that . . . § 1983 is not applicable to federal employees or federal officers."   (ECF Nos. 60 at 79; 62 at 9 (citing *Wheeldin v. Wheeler*, 373 U.S. 647, 650 (1963).)

Plaintiff concedes that "[w]ith respect to King and Lowther," they were federal actors. (ECF No. 68 at 11.)   Thus, Defendants Lowther and King's motion for summary judgment is **GRANTED**, and Plaintiff's claims against them pursuant to 42 U.S.C. § 1983 are **DISMISSED**.

Defendant Martin makes the same argument: Because he was a specially deputized member of the Cuffed Task Force, he was properly considered a federal actor during the above incident such that Plaintiff cannot maintain her § 1983 claim against him.   (ECF No. 64 at 3.) Martin acknowledges that he was employed as a deputy with the Kanawha County Sheriff's Department at the time, but maintains that as a Special Deputy with the United States Marshals Service, he did not lose his federal scope of employment status, even while also executing a state arrest warrant.   (*Id.* at 4.)   Martin asserts that this fact is further bolstered by the oath he took, which affirmed that he would "faithfully execute all lawful orders issued under the authority of the United States directed to the United States Marshal, the United States Marshals Service, or to an appropriate Federal Official."   (ECF No. 63–3.)   Finally, Martin argues that Plaintiff has failed to produce any evidence that would even dispute that Martin was acting outside of the scope of the federal Cuffed Task Force.   (ECF No. 64 at 5–6.)

Plaintiff, however, disagrees and argues that there is a dispute as to whether Martin was acting as a state or federal actor, or both.   (ECF No. 68 at 11.)   In support of this assertion,

Plaintiff asserts that the arrest warrant to be executed by the task force was issued by the Circuit Court of Kanawha County, a state court; the tip that alerted the task force of Kiewra's whereabouts came from the Kanawha County Sheriff; Martin was employed by the Kanawha County Sheriff; the records and reports related to the arrest were records of the Kanawha County Sheriff; Kiewra was transported to South Central Regional Jail; and Martin was paid by Kanawha County for his work on the day in question. (*Id.*)   Considering all of these facts, Plaintiff asserts that Martin "had full authority to, and did, act as a Kanawha County Sheriff Deputy," such that her § 1983 claim against him survives. (*Id.* at 12.)

The United States Marshals Service possesses the authority to deputize "federal, state, or local law enforcement officers whenever the law enforcement needs of the U.S. Marshals Service so require" to perform the functions of a Deputy United States Marshal. 28 C.F.R. § 0.112(b)." Furthermore, Congress has expressly authorized the Marshals Service to investigate fugitive matters. *See* 28 U.S.C. § 566(e)(1)(B) ("The United States Marshals Service is authorized to . . . investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General.").   *See also* 34 U.S.C. § 41503(a) ("The Attorney General shall, . . ., establish permanent Fugitive Apprehension Task Forces consisting of Federal, State, and local law enforcement authorities . . ., to be directed and coordinated by the United States Marshals Service, for the purpose of locating and apprehending fugitives.").   Relevant here, 5 U.S.C. § 3374(c) establishes the following:

> (c)   During the period of assignment, a State or local government employee on detail to a Federal agency—
>
> (1) is not entitled to pay from the agency, except to the extent that the pay received from the State or local government is less than the appropriate rate

of pay which the duties would warrant under the applicable pay provisions of this title or other applicable authority;

(2) is deemed an employee of the agency for the purpose of chapter 73 of this title, the Ethics in Government Act of 1978, chapter 21 of title 41, sections 203, 205, 207, 208, 209, 602, 603, 606, 607, 643, 654, 1905, and 1913 of title 18, sections 1343, 1344, and 1349(b) of title 31, and the Federal Tort Claims Act and any other Federal tort liability statute; and

(3) is subject to such regulations as the President may prescribe.

The supervision of the duties of such an employee may be governed by agreement between the Federal agency and the State or local government concerned. A detail of a State or local government employee to a Federal agency may be made with or without reimbursement by the Federal agency for the pay, or a part thereof, of the employee during the period of assignment, or for the contribution of the State or local government, or a part thereof, to employee benefit systems.

Thus, § 3374(c)(2) expressly provides that a local government employee who is assigned to a federal agency, like the United States Marshals Service, "is deemed an employee of the agency for the purpose of . . . the Federal Tort Claims Act and any other Federal tort liability statute."

Numerous courts that have examined this issue have reasoned that members of these federal fugitive task forces do not lose the scope of their federal employment while they are executing state arrests warrants.  *See King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019) (noting that the fact that members of a federal fugitive task force were executing a state arrest warrant did not make them state actors rather than federal actors—the "nature and character" of the federal task force did not change based on whether it chose to pursue a state or federal fugitive), *rev'd on other grounds*, *Brownback v. King*, 141 S. Ct. 740 (2021); *United States v. Smith*, 743 F. App'x 943, 947–48 (11th Cir. 2018) (holding that a local sheriff who was a special deputy United States Marshal on a federal fugitive task force was within his scope of employment as a special

10

deputy while engaged in execution of a state arrest warrant), *cert. denied*, 139 S. Ct. 1206 (2019); *United States v. Diamond*, 53 F.3d 249, 252 (9th Cir.) (same), *cert. denied*, 516 U.S. 925 (1995). "As federal agents, cross-deputized local law enforcement officers avoid prosecution under section 1983 because they are not acting under color of state law." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 534–35 (M.D.N.C. 2008).

The Sixth Circuit's opinion in *King* is particularly instructive in this matter. There, the court stated that the "evaluation of whether particular conduct constitutes action taken under the color of state [or instead federal] law, must focus on the *actual nature and character* of that action." *King*, 917 F.3d at 433 (emphasis added). With this focus in mind, the court held that a detective who was employed with a city police force was working on an FBI task force and therefore a federal employee during the incident in question. *Id.* The plaintiff in the case could not demonstrate that "the state was involved in authorizing or administering the task force," nor could the plaintiff show that the detective was otherwise acting under state authority. *Id.* Instead, the detective "carried federal authority" as a deputized federal agent and acted under color of federal law, as opposed to state law. *Id.* Moreover, the court reasoned that even if the detective was enforcing a state law warrant, based on the commission of a state law crime, "the nature and character of a cooperative federal-state program is determined by the source and implementation of authority for the *program*, not for the particular work that the agency chooses, in the exercise of its authority, to perform on a given day." *Id.* (emphasis in original). Because the nature and character of the task force is determined by the federal authority under which it was implemented, the detective was considered a federal actor. *See also Ellis v. Ficano*, 1995 WL 764127, at *6 (6th Cir. Dec. 27, 1995) (affirming that federal officers are subject to a claim under

11

*Bivens* for alleged constitutional deprivations); *Lawson v. McNamara*, 438 Fed. Appx. 113, 115, n.1 (3rd Cir. 2011) (federal constitutional claims against Special United States Deputy Marshals assigned to a Violent Crimes Fugitive Task Force are considered *Bivens* claims against federal actors rather than claims brought against state actors under 42 U.S.C. § 1983); *United States v. Martin*, 163 F.3d 1212, 1214 (10th Cir. 1998) (local police detective deputized to participate in federal narcotics investigation is a federal officer within the meaning of 18 U.S.C. § 115(a)(1)(B)); *United States v. Torres*, 862 F.2d 1025, 1030 (3d Cir. 1988) (same).

Similar to the case at hand, *King* explains why Martin must be considered a federal actor. Martin was a specially deputized officer working on the United States Marshals Service Cuffed Task Force. (ECF No. 64–3.) The Sponsoring Agency is identified as the United States Marshals Service, a federal agency. (*Id.*) Martin's oath of office confirms that he was carrying and acting according to federal authority, as do the Terms of Special Deputization. (*Id.* ("I will faithfully execute all lawful orders issued *under the authority of the United States*[.]") While Plaintiff asserts that the warrant to be executed was issued by the state, and that Martin worked for the state when not specially deputized, Plaintiff has failed to show any evidence that it was the *state* who was authorizing or administering the Cuffed Task Force. The fact that Martin was paid by Kanawha County for the work that day is nothing more than a statutorily prescribed occurrence, *see* 5 U.S.C. § 3374(c)(1), and the remaining facts simply do not rise to the level of a genuine dispute that is material. As demonstrated by statute and regulation, the Marshals Service is authorized to investigate, locate, and apprehend fugitives, regardless where the warrant originated. *See, e.g.*, 28 U.S.C. § 566(e)(1)(B); 34 U.S.C. § 41503(a). Despite Plaintiff's attempts to tie Martin to the state, the nature and character of the joint Cuffed Task Force is federal, authorized by

federal statute and administered by a federal law enforcement agency.   As such, Martin was a federal actor on the occasion in question.   Because he was a federal actor, Plaintiff cannot maintain a § 1983 claim against him.   *Wheeldin v. Wheeler*, 373 U.S. 647, 650 (1963).

For the foregoing reasons, Martin's motion is **GRANTED**, and Plaintiff's § 1983 claim against Martin is **DISMISSED**.   With Plaintiff's claims now identified as being brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Court will proceed to the parties' arguments in the *Bivens* context.

### B.  *Plaintiff's Claims under* Bivens

Lowther, King, and Martin all next argue that Plaintiff's claims under *Bivens* must be dismissed because *Bivens* does not provide her a remedy against the officers.   (ECF Nos. 60 at 10–11; 62 at 10–11; 64 at 6.)   Each argues that the continuing validity of *Bivens* is in doubt, and that because of a recent trio of decisions by the Supreme Court of the United States, Plaintiff's claims are no longer viable.   (*See* ECF Nos. 60 at 11; 62 at 11; 64 at 6.)   Citing a two-step test to determine whether a *Bivens* claim is viable, Defendants argue that Plaintiff's claims fail under both steps.   First, Defendants argue that this specific fact pattern gives rise to a "new *Bivens* context, and second, that because there exists an alternative remedy—namely, the Federal Tort Claims Act ("FTCA")—the special factors analysis counsels against allowing her claims to proceed.   (*See* ECF No. 60 at 18.)   As to Lowther, he argues specifically that his actions especially arise in a new *Bivens* context and are therefore inapplicable, as Plaintiff is attempting to attach a "failure to intervene" theory of liability which has never been recognized under *Bivens*.   (*Id.* at 17.)

Plaintiff counters that this case, rather than arising in a new context, actually occurred "under nearly identical circumstances" to *Bivens*, thus signaling the viability of her claim.   (ECF

No. 68 at 13.)   Furthermore, Plaintiff argues that because this case is "not an extension of *Bivens* so much as a replay," there is no need to even conduct the "special factors" analysis.   (*Id.* at 18–19 (quoting *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020).)   Finally, Plaintiff maintains that the existence of alternative relief in no way affects her *Bivens* claims, arguing that the Supreme Court has long held that "Congress views FTCA and *Bivens* as parallel, complementary causes of action."   (*Id.* at 15 (quoting *Carlson v. Green*, 446 U.S. 14, 20 (1980).)

In 1971, the Supreme Court created an implied cause of action for money damages under the Fourth Amendment in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).   In *Bivens*, agents of the Federal Bureau of Narcotics allegedly entered the plaintiff's apartment, handcuffed and placed him under arrest for alleged narcotic violations, threatened to arrest his wife and children, and then searched his entire apartment "from stem to stern," and all without a warrant or probable cause.   *Id.* at 390.   In finding for the plaintiff, the Supreme Court recognized that individuals are "entitled to recover money damages for any injuries" suffered as the result of constitutional violations by federal actors.   *Id.* at 397.   *See also Hernandez v. Mesa*, — U.S.—, 140 S.Ct. 735, 741 (2020) ("In [*Bivens*], the Court broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages against the responsible agents[.]")

After *Bivens*, however, the Supreme Court only created implied causes of action for money damages in two other cases alleging constitutional violations: (1) a claim of sex discrimination under the Fifth Amendment in *Davis v. Passman*, 442 U.S. 228 (1979), and (2) a prisoner's claim of inadequate medical care under the Eighth Amendment in *Carlson v. Green*, 446 U.S. 14 (1980).   *See Egbert v. Boule*, — U.S. —, 142 S.Ct. 1793, 1802 (2022).   In fact, the Supreme Court

14

declined 11 different times to imply similar causes of action for other alleged constitutional violations in the years since *Bivens* was decided. *Id.* at 1799–1800. "In both statutory and constitutional cases, our watchword is caution." *Hernandez*, 140 S.Ct. at 742.

Indeed, the Supreme Court has come to "appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power." *Id.* at 741. In exercising such caution, the Court has recently and more strongly "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. —, 137 S.Ct. 1843, 1857 (2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2017)). In fact, in *Hernandez*, the Court determined that "a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress, . . . and no statute expressly creates a *Bivens* remedy." 140 S.Ct. at 742. *See also Egbert*, 142 S.Ct. at 1809 ("And, more recently, we have indicated that if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution.") Despite calling into doubt the validity of the "implied rights" underpinning *Bivens*, the Supreme Court has not yet reconsidered or overturned *Bivens* itself. *Egbert*, 142 S.Ct. at 1809.[6]

Because the Supreme Court has not yet abrogated *Bivens* completely, it has instructed that a court's analysis of a potential *Bivens* cause of action is to proceed under two steps. *See, e.g.,*

---

[6] The Court notes that even while the scope of *Bivens* appears to be narrowing, the Supreme Court does not seem to question the validity of the Constitution allowing for the redress of injuries:

> And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

*Abassi*, 582 U.S. at —, 137 S.Ct. at 1856–57.

*Hernandez*, 140 S.Ct. at 743 ("When asked to extend *Bivens*, we engage in a two-step inquiry.")

First, the reviewing court must ask "whether the request involves a claim that arises in a 'new

context' or involves a 'new category of defendants.'"   *Id.* (citing *Correctional Services Corp. v.*

*Malesko*, 534 U.S. 61, 68 (2001)).   Second, when a claim is found to arise in a new context, the

reviewing court must ask "whether there are any 'special factors [that] counse[l] hesitation' about

granting the extension."   *Id.* (quoting *Abbasi*, 582 U.S. at —, 137 S.Ct. at 1857).

The meaning of arising in a new context is quite broad.   *Id.*   "If the case is different in a

meaningful way from previous *Bivens* cases decided by this Court, then the context is new."

*Abassi*, 582 U.S. —, 137 S.Ct. at 1859.   A new context also arises when there are "potential

special factors that previous *Bivens* cases did not consider."   *Abassi*, 582 U. S., at —, 137 S.Ct. at

1860.   The Supreme Court identified several more examples in which a claim may be considered

to have arisen in a new context:

> A case might differ in a meaningful way because of the rank of the officers
> involved; the constitutional right at issue; the generality or specificity of the official
> action; the extent of judicial guidance as to how an officer should respond to the
> problem or emergency to be confronted; the statutory or other legal mandate under
> which the officer was operating; the risk of disruptive intrusion by the Judiciary
> into the functioning of other branches; or the presence of potential special factors
> that previous *Bivens* cases did not consider.

*Id.* at 1860.   Presenting the above list as non-exhaustive, the Court cautioned that "no court could

forecast every factor that might 'counse[l] hesitation.' . . . Even in a particular case, a court likely

cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. . . .

That uncertainty alone is a special factor that forecloses relief."   *Egbert*, 142 S.Ct. at 1803–04

(internal citations omitted).

16

Germane to this case then is specifically what occurred in *Bivens*.   There, agents of the Federal Bureau of Narcotics carried out an arrest and search of the plaintiff's apartment for alleged narcotics violations.   *Bivens*, 403 U.S. at 389.   The federal agents handcuffed the plaintiff in front of his family, while threatening to arrest them as well.   *Id.*   The agents then searched the apartment "from stem to stem."   *Id.*   The plaintiff was thereafter taken to the federal courthouse where he was "interrogated, booked, and subjected to a visual strip search."   *Id.*   The agents allegedly carried out both the search and arrest without a warrant or probable cause.   *Id.*   Fairly read, the federal agents committed an unreasonable search and seizure when they manacled the plaintiff and searched his apartment without a warrant or probable cause.   *See Egbert*, 142 S.Ct. at 1802; *Abbasi*, 582 U. S., at —, 137 S.Ct. at 1848; *Davis v. Passman*, 442 U.S. 228, 233–34 (1979).

Despite the increasingly narrow scope of a *Bivens* action, the Court finds that Plaintiff's claims against King, Lowther, [7] and Martin here are not an extension of *Bivens*.   Instead, Plaintiff's claims fit rather neatly into the original *Bivens* action itself.   Plaintiff seeks to hold accountable federal agents for their forcible detention of herself and the entry and search of her home without a valid warrant or her consent.   In other words, Plaintiff seeks redress for the alleged unreasonable search and seizure committed by federal officers in executing an arrest. "[A]long every dimension the Supreme Court has identified as relevant to the inquiry, this case appears to represent not an extension of *Bivens* so much as a replay[.]"   *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020) ("Just as in *Bivens*, Hicks seeks to hold accountable line-level agents

---

[7] Lowther argues that the *Bivens* claim against him clearly arises in a new *Bivens* context because Plaintiff is attempting to assert a theory of bystander liability, which is meaningfully different than what occurred in *Bivens*. (ECF No. 60 at 17.)   Plaintiff disagrees, asserting that Lowther admitted to entering the residence.   (*See* ECF No. 68 at 19, n.9.)   A review of the record shows that Lowther did admit to entering the residence.   (*See* ECF No. 68–7 at 4 ("The only house I went into was the Deavers house[.]"); 8 ("The door from the porch that went into the residence was open.   And then I made it about five steps in to that before I saw a task force officer bringing out Kiewra in handcuffs[.]").)   Accordingly, Lowther's argument fails.

of a federal criminal law enforcement agency, for violations of the Fourth Amendment, committed

in the course of a routine law-enforcement action.")   Because these facts do not arise in a new

*Bivens* context, it is unnecessary to proceed to the special factors prong of the analysis.[8]

Accordingly, Lowther and King's motions for summary judgment, (ECF Nos. 59 and 61

respectively), are **DENIED** as they pertain to Plaintiff's claims pursuant to *Bivens v. Six Unknown

Named Agents*, 403 U.S. 388 (1971).[9]   Martin, however, raises another defense as to why he is

entitled to summary judgment on Plaintiff's *Bivens* claim, which the Court addresses next.

### C.  Qualified Immunity

Next, Martin argues that he is entitled to qualified immunity.[10]   Martin asserts that, prior

to November 2020, the case law regarding when an officer can enter a third-party residence to

execute a valid arrest warrant was "murky," thus showing that Martin was not "plainly

incompetent" or "transgress[ing] bright lines" in entering Plaintiff's residence to arrest Kiewra.

(ECF No. 64 at 15.)   Martin argues that it was not until November 2020 that the Fourth Circuit

Court of Appeals first concretely established that law enforcement officers, armed with only an

arrest warrant, may not force entry into a home where they believe the suspect resides based on

---

[8] On September 13, 2022, King and Lowther submitted a memorandum titled "Supplemental Authorities in Support of their Motions for Summary Judgment."   (ECF No. 96.)   This memorandum discussed several recently-decided cases interpreting *Egbert* from other district courts, and also asserted several more arguments for summary judgment in their favor.   (*See id.*)   On September 15, Plaintiff filed a Motion to Strike, arguing that King and Lowther's submission ran afoul of Local Rule of Civil Procedure 7.1(a)(7), which establishes that "[s]urreply memoranda shall not be filed except with leave of court."   (ECF No. 97.)   Because King and Lowther did not seek leave of this Court to file their supplement, Plaintiff's motion, (ECF No. 97), is **GRANTED** and the Supplemental Authorities, (ECF No. 96), is struck.   Regardless, as the Court explained above, because this case is not an extension of *Bivens*, King and Lowther's arguments would fail.

[9] The Court notes here that Plaintiff conceded her claims for excessive force and unlawful detainer against both Martin and Lowther.   (ECF No. 68 at 9, n.5.)

[10] As described above, Lowther and King both argued that they too are entitled to qualified immunity, but in failing to timely raise this defense at the summary judgment deadline, they have waived this argument.   *See supra* note 1.

anything less than probable cause.   (*Id.* citing *United States v. Brinkley*, 980 F.3d 377, 386 (4th Cir. 2020).)

Curiously, Plaintiff did not directly address Martin's argument as to qualified immunity, save for declaring that she "will not address this claim in a separate section as it is clear from the testimony presented in this section that Martin is not entitled to qualified immunity."   (ECF No. 68 at 8, n.4.)   Instead, Plaintiff seems to rely solely on the argument that her constitutional rights were violated by the officers.   (*See id.* at 5.)   Plaintiff argues that the Supreme Court's opinion in *Steagald v. United States*, 451 U.S. 204, 205–06 (1981) is "directly on point and analogous to the facts of this case," and therefore controls.   (*Id.* at 5.)   Plaintiff further argues that because none of the officers here knew whether Kiewra actually resided at Plaintiff's residence, they should have also known that they needed a search warrant to "legally search for the subject of an arrest warrant in the home of a third party."   (*Id.* at 6 (quoting *Steagald*, 451 U.S. at 205).)   Thus, Plaintiff argues that Martin is not entitled to summary judgment and that "if anything, summary judgment on the question of the unlawful entry should be granted in favor of [her]."   (*Id.* at 9.)

Qualified immunity is "an immunity from suit rather than a mere defense to liability."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).   *See also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("We repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."); *accord Robinson v. Pack*, 679 S.E.2d 660 (W. Va. 2009) ("We agree with the United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial.").   "However, where the legal question of qualified immunity turns upon which version of the facts one accepts,

19

the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A reviewing court must ask two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a violation of a constitutional right is shown, the court must decide whether that right was clearly established at the time of the misconduct. *Pearson*, 555 U.S. at 236. *Pearson* instructs that in answering these questions, a court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

"A constitutional right is 'clearly established' when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). While a clearly established right does not require a case that is factually "on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"The inquiry into reasonableness is an objective one."   *Weigle v. Pifer*, 139 F.Supp.3d 760, 768 (S.D. W. Va. 2015). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.   "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'"   *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (quoting *Graham*, 490 U.S. at 396–97).

Though addressed separately from his qualified immunity defense, Martin argues that he committed no constitutional violation when he entered the Plaintiff's home under the Supreme Court's decision in *Payton v. New York*, 445 U.S. 573, 603 (1980).   (ECF No. 64 at 12–13.)   But he also argues that the constitutional right at issue here was not "clearly established" at the time the Cuffed Task Force arrested Kiewra.   (*Id.* at 14.)   Plaintiff, conversely, relies on the Supreme Court's decision in *Steagald*, 451 U.S. at 205–06, and asserts that its "edict" is "beyond debate."[11] (*Id.* at 8, n.4.)

*Payton*, decided only a year before *Steagald*, recognized that there were limited occasions when a law enforcement officer could enter a private home with only an arrest warrant to apprehend a suspect.   445 U.S. at 603.   "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."   *Id.*   The Fourth

---

[11] The Court believes that Plaintiff is seemingly implying that *Steagald* clearly establishes the need for officers to obtain a search warrant to search for the subject of an arrest warrant in the home of a third-party.   However, as this implication is drawn not from her express argument but instead her declaration she will not address Martin's qualified immunity defense because "[t]here was a clear constitutional violation here," the Court is left with an underdeveloped argument as to why qualified immunity should not apply.

Circuit, in interpreting *Payton*, settled on a two-part analysis for determining whether police entry into a private residence was lawful: "(1) whether there is reason to believe that the location is the defendant's residence, and (2) whether or not there was a 'reasonable belief' that he would be home." *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011) (citing *United States v. Graham,* 553 F.3d 6, 13 (1st Cir. 2009); *see also United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir. 1995), *cert. denied,* 516 U.S. 869 (1995)).   Recognizing the "diverse views" on the topic taken by the other Circuit Courts of Appeals, the Fourth Circuit declined to define "reason to believe" or to "reach a conclusion as to whether 'reason to believe' is as stringent as 'probable cause[]." *Id.* at 263.   In November 2020, the Fourth Circuit addressed the question and concluded that the term "reasonable to believe" equates to "probable cause."   *Brinkley*, 980 F.3d at 386 ("It seems to us that interpreting reasonable belief to require probable cause hews most closely to Supreme Court precedent and most faithfully implements the special protections that the Fourth Amendment affords the home.").

While *Payton* dealt with law enforcement in possession of only an arrest warrant and seeking to enter the suspect's own home, *Steagald* addressed whether an arrest warrant alone authorized police to enter a third party's home, concluding that it did not.   *Steagald*, 451 U.S. at 213.   There, the Supreme Court recognized that, unlike *Payton*, "two distinct interests" were at stake: "[the suspect's] interest in being free from an unreasonable seizure," and "[the third party's] privacy interest in being free from an unreasonable invasion and search of his home."   *Id.* at 216.   Recognizing that an arrest warrant protects the former, the Supreme Court noted that the arrest warrant did "absolutely nothing" to protect the privacy interest of the latter.   *Id.*   Accordingly, *Steagald* held that absent exigent circumstances, law enforcement would be required by the Fourth

Amendment to obtain a search warrant before trying to apprehend a suspect in a third party's

home.  *Id.*

The Fourth Circuit eloquently summarized the relation between *Payton* and *Steagald* as

follows:

> *Steagald* sheds particular light on how *Payton* must be interpreted to respect the
> home's privileged status under the Fourth Amendment. As noted above, when
> officers armed with an arrest warrant seek to apprehend the suspect in a third party's
> home, *Steagald*, not *Payton*, controls, and requires police to obtain a search warrant
> founded on probable cause in order to enter the home. But *Payton* controls when
> officers *believe* that the suspect resides in a certain home, even if they are
> mistaken. . . . Under these circumstances, the home's actual residents are no longer
> entitled to the judicial authorization founded on probable cause
> that *Steagald* guarantees; *Payton*'s "reason to believe" standard is all that protects
> their weighty Fourth Amendment privacy interests. Thus, when police seek to enter
> a home and are uncertain whether the suspect resides there, interpreting reasonable
> belief to require less than probable cause "would effect an end-run around . . .
> *Steagald* and render all private homes . . . susceptible to search by dint of mere
> suspicion or uncorroborated information and without the benefit of any judicial
> determination."

*Brinkley*, 980 F.3d at 385–86 (emphasis in original) (internal citations omitted).

This brings the Court full circle on the question of whether Martin is entitled to qualified

immunity, which the Court answers in the negative.   Until the Fourth Circuit's decision in

*Brinkley*, and pursuant to *Payton*, a law enforcement officer only needed "reason to believe" that

the location in question was the suspect's residence.   *See United States v. Hill*, 649 F.3d 258, 262

(4th Cir. 2011).   In fact, the Fourth Circuit identified at least three different standards used by the

different Circuit Courts of Appeals to interpret "reason to believe."   *Id.* at 262–63 (noting some

circuits equated reasonable belief to probable cause, others opining that the difference was

indefinite, and others still finding requirements as less than probable cause) (collecting cases).

*Brinkley*, however, established for the first time in the Fourth Circuit that "reason to believe"

means "probable cause." *Brinkley*, 980 F.3d at 386.   Importantly, *Brinkley* was not decided until November 13, 2020, almost five months after the incident alleged here took place, meaning that the constitutional right at issue was not clearly established.

However, the Court cannot find that Martin is entitled to qualified immunity as there appears to be a genuine dispute over a material fact: Whether the Task Force had reason to believe that Kiewra resided at Plaintiff's residence.   *See Pouillon*, 206 F.3d at 715 ("However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").   Contrary to Plaintiff's assertions, there is evidence that Martin believed that Kiewra was residing at Plaintiff's residence at the time of her arrest.   First, the Kanawha County Sheriff received the tip that Kiewra was staying at the residence.   (ECF No. 68–1.)   Based on that tip, the Cuffed Task Force traveled to the location and conducted "regular ground police work," such as knocking on doors and showing Kiewra's photograph to individuals. (ECF No. 68–5 at 4.)   Martin specifically recalls that one man was able to identify Kiewra's photograph and stated that he knew "*where [Kiewra] lives* because I went to school with Tabitha." (*Id.* (emphasis added).)   That individual was able to describe the residence, and the Cuffed Task Force members proceeded to the address.   (*Id.*)   Upon arrival, Plaintiff confirmed to Martin that Kiewra was physically located inside the residence.   (*Id.*)   Yet, Plaintiff has also shown that Martin "had no idea" where Kiewra lived and that Kiewra was "homeless" every time Martin had previously dealt with her.   (ECF No. 68-5 at 6–7.)   Plaintiff further asserts that the Task Force did not have any information regarding Kiewra's residence, did not investigate whether Kiewra resided with the Deavers, and instead "made an (incorrect) assumption that Kiewra lived there." (ECF No. 68 at 7.)

24

Based on the above, the Court believes that there is a genuine question as to whether Martin had a reason to believe that Kiewra resided at Plaintiff's residence. Accordingly, this question is better suited for determination by a jury, not the Court. Therefore, Martin's motion for summary judgment is **DENIED**.

D.      *Kanawha County Commission*

Defendant Kanawha County argues that it cannot be held liable for Martin's actions as he was not acting under its supervision at the time of the arrest and entry into Plaintiff's residence. (ECF No. 64 at 17.)   Instead, Kanawha County asserts that he was within the scope and authority of the federal task force at the time of the incident.   (*Id.*)   Additionally, Kanawha County maintains that it is statutorily immune from Plaintiff's claims pursuant to W. Va. Code § 29-12A-4(b)(1).   (*Id.*)   Finally, to the extent that Plaintiff asserts a claim against it pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), Kanawha County maintains that she has failed to present any evidence that the county was the "moving force" behind any constitutional violation.   (*Id.* at 20.)

Plaintiff, in her response, clarifies that she is "not seeking recovery from [Kanawha County] for the acts of Martin," but rather because Kanawha County was "negligent and violated her rights because it failed to properly train Martin which manifested in his deliberate indifference to Plaintiff."   (ECF No. 68 at 19.)   Plaintiff contends that Kanawha County's apparent failure to properly train its officers' is, at the very least, a question of material fact.   (*Id.*)

"A municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be

subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*,

436 U.S. at 692).   A policy for which a municipality may be held liable arises in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

"For a municipality to be liable under § 1983 for failing to properly train police,

the failure to train must 'amount[ ] to deliberate indifference to the rights of persons with whom

the police come into contact.'" *Estate of Jones v. City of Martinsburg, West Virginia*, 961 F.3d

661, 672 (4th Cir. 2020) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).   If the

municipality's failure to train "reflects such a deliberate or consciously indifferent policy," then

the municipality's failure can be considered the "moving force [behind] the constitutional

violation." *Id.* at 671–72 (quoting *Harris*, 489 U.S. at 389).   Failure to train can only form a

basis for liability if "it can be shown that policymakers were aware of, and acquiesced in, a pattern

of constitutional violations." *Harris*, 489 U.S. at 397.   Furthermore, the injury itself must be

closely related to the failure to train, "meaning it must cause the incident." *Estate of Jones*, 961

F.3d at 672.   Additionally, as a *Monell* claim is not compatible with the theory of *respondeat*

*superior*, "a single incident is almost never enough to warrant municipal liability. " *Id.* at 672.

*See Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999) ("[P]roof of a single

incident of the unconstitutional activity charged is not sufficient to prove the existence of a

municipal custom.").

It is difficult to see how Kanawha County could be considered the moving force behind the

alleged constitutional violation, when the county itself was not behind the implementation or administration of the Cuffed Task Force.[12]   But more than the lack of connection to the task force, Plaintiff has failed to show evidence that the training required by Kanawha County is deficient. In its Responses to Plaintiff's First Set of Discovery, Kanawha County notes that it does not provide, nor is it responsible for, training officers "with respect to any task force not specifically led by the Kanawha County Sheriff's Department."   (ECF No. 68–9 at 4.)   Those responses also show that Kanawha County provides general training to the officers, which is "wide-ranging, varied, and on-going."   (*Id.*; *see also* ECF No. 72 at 8.)   Plaintiff fails to show precisely how this training was deficient, instead concluding that Martin's actions were "[c]learly . . . indifferent to the rights of Plaintiff," while then speculating that had Kanawha County "property [*sic*] trained Martin on the execution and service of warrants, perhaps the incident would not have occurred." (ECF No. 68 at 20.)   There is nothing in the record that would show that the policymakers for Kanawha County "were aware of, and acquiesced in, a pattern of constitutional violations." *Canton*, 489 U.S. at 397.   Accordingly, Plaintiff has failed to show that there is a genuine dispute of material fact as it pertains to her *Monell* failure-to-train claim against Kanawha County.

For those reasons, Kanawha County's motion for summary judgment is **GRANTED**, and Plaintiff's claims against it are hereby **DISMISSED**.

## IV.    CONCLUSION

For the reasons more fully explained above, Scott Lowther's Motion for Summary Judgment, (ECF No. 59), is **GRANTED IN PART** and **DENIED IN PART**; Mike King's Motion

---

[12] Notably, "intergovernmental associations," like the Cuffed Task Force, may themselves be subject to suit under § 1983, if the parties that created it intended to create a separate legal entity.   *See Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995).   However, the parties have not raised this argument, and there appears to be little evidence addressing the intent in the creation of the Cuffed Task Force.

for Summary Judgment, (ECF No. 61), is **GRANTED IN PART** and **DENIED IN PART**; and

Joshua Martin and the Kanawha County Commission's Motion for Summary Judgment, (ECF No.

63), is **GRANTED IN PART** and **DENIED IN PART**.   As Kanawha County has no remaining

claims pending against it, Kanawha County is hereby **DISMISSED** from this action.

      **IT IS SO ORDERED**.

      The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

                ENTER:      September 19, 2022

                THOMAS E. JOHNSTON, CHIEF JUDGE